UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

            - v -                    :                    <u>OPINION</u>

ROBERT BANKS,                    :                    99 Cr. 1048-1 (DC)

             Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:   DAMIAN WILLIAMS, Esq.
               United States Attorney for the Southern District of New York
               By: Jaclyn Delligatti, Esq.
               Assistant United States Attorney
               One Saint Andrew's Plaza
               New York, New York  10007

               ROBERT BANKS, *pro se*
               Register No. 48367-054
               Federal Correctional Institution Allenwood (Medium)
               P.O. Box 2000
               White Deer, PA  17887

CHIN, Circuit Judge:

         Before the Court is defendant Robert Banks's *pro se* motion for a

sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Dkt. No. 269 (the

"Motion").  For the reasons set forth below, the Motion is granted, and Banks's

term of imprisonment is reduced to time served plus no more than ten days.

I.      **Background**

When Banks was 20 years old, he made the first of a series of terrible decisions that have resulted in his incarceration for more than twenty-three years. Banks's childhood friend Daniel Mercedes was related by blood to one of the leading participants in a major heroin distribution ring. Defendant's Sentencing Memorandum ("Def. Sent'g Mem.") at 3. Banks joined the organization, which Juan Matos Reyes, also known as "Junior," directed from the Dominican Republic. Presentence Investigation Report ("PSR") ¶¶ 29-30. Reyes's workers in the Bronx packaged heroin by the kilogram and distributed it to members of the organization, including Banks, who then sold smaller quantities of heroin around the borough. *Id*. The organization kept a cache of automatic weapons and silencers at its "stash house." Government's Sentencing Memorandum at 1; PSR ¶ 30.

Banks sold heroin for some three years, from 1996 to 1999. PSR ¶ 5. The quantity of drugs for which he admitted responsibility was massive -- over 400 kilograms. Sentencing Transcript ("Sent'g Tr.") at 11. In 1998, Banks became involved in something perhaps even more serious. Two of the Reyes organization's deliverymen were suspected of having stolen approximately two

kilograms of heroin and tens of thousands of dollars from the organization.  PSR
¶ 31.  In retaliation, Reyes and his confederates hired a team to murder the
accused deliverymen.  PSR ¶ 32.  The team achieved part of its purpose, killing
Johan Pena-Perez on May 26, 1998; the other deliveryman, Nilton Duran, was
seriously wounded but survived.  PSR ¶ 32-35.  One of the killers was arrested at
the scene, PSR ¶ 36, and another was apprehended two weeks later, PSR ¶ 39;
the others remained at large.  Reyes directed Banks to give the fugitive hitmen
$10,000 to ease their flight.  PSR ¶ 41.  Banks acquiesced, even though he was
aware the purpose of the funds was to facilitate the killers' escape.  Plea Tr. at 18-
19; PSR ¶ 41.

More than a year later, even though the Reyes organization was "out
of business" and Banks's friend Daniel Mercedes had quit the drug trade, Banks
was still selling heroin.  Sent'g Tr. at 13.  On October 12, 1999, at age 23, he was
arrested with small quantities of heroin, a loaded 9mm semiautomatic weapon,
and drug ledgers.  *Id.*; PSR ¶ 42.

Banks had no prior criminal history.  PSR ¶¶ 74-76.  In 1993, he
graduated from All Hallows High School, where he had earned a scholarship
and participated in intercollegiate athletics, the math club, and the drama club.

One of his teachers recalled that he was "a sensitive and caring young man who had good friends." Sent'g Letter of Anthony Bechner (June 19, 2002). Banks's parents, who left the Dominican Republic and came to the United States in 1978, when Banks was two, created a "loving and supportive" household and provided Banks with "moral, cultural, and educational values." PSR ¶ 78.

Nonetheless, Banks spent several years furthering the activities of Reyes's heroin distribution ring. He was initially charged by Indictment with murder-for-hire and conspiracy to distribute heroin. Dkt. No. 1. A Superseding Indictment added a death-eligible charge of murder while engaged in a conspiracy to distribute narcotics, in violation of 18 U.S.C. § 848(e). Dkt. No. 33 at 4-5. In October 2001, prosecutors informed Banks the Government would not seek the death penalty. Letter from Marc L. Mukasey, Assistant U.S. Attorney, to J. Bruce Maffeo, defense counsel, et al. (Oct. 18, 2001).

Approximately two weeks before trial, Banks pleaded guilty before this Court to one count of conspiracy to distribute and possess with intent to distribute heroin, in violation of 18 U.S.C. § 846, and one count of being an accessory after the fact to murder, in violation of 18 U.S.C. § 3. Plea Tr. at 22. Banks admitted he was involved in distributing hundreds of kilograms of heroin.

*Id*. at 16.  As to his role in Pena-Perez's murder, Banks stated that "Junior" had

called him from the Dominican Republic, "saying that people had robbed him of

some drugs and money."  *Id*. at 17.  "Junior" called back a few days later, saying

"[h]is people had to leave the country" and asking Banks to provide them with

money.  *Id*. at 18.  Banks did so, not wavering even when the hitmen told him

they had been involved in a murder.  *Id*.

  At sentencing, Banks was 26 years old.  I calculated a then-

mandatory Sentencing Guidelines range of 324 to 405 months' imprisonment and

noted that the Probation Department recommended a sentence at the top of the

range.  Sent'g Tr. at 6.  The Government, too, urged me to impose a sentence at

the top of the Guidelines range, based on the volume of drugs Banks sold and his

willingness to help Reyes, his organization, and the hitmen avoid responsibility

for murder.  *Id*. at 11-13.  Defense counsel observed that a sentence of 405

months' imprisonment would mean Banks would "be incarcerated for longer

than he has been alive."  *Id*. at 7.  Urging a sentence toward the lower end of the

Guidelines range, defense counsel pointed to Banks's wife and family, including

his two young children; the support Banks continued to receive from his parents,

siblings, and other relatives; and the promise Banks had shown prior to his

involvement in the Reyes organization.  *Id*. at 7-10; *see also* Def. Sent'g Mem. at 2-3.[1]  Banks expressed remorse for his conduct, saying "it was surely wrong what I did."  Sent'g Tr. at 10.

Before imposing sentence, I commented on Banks's age, his lack of prior convictions, his supportive family, and the length of "hard time" he was facing.  *Id*. at 14.  "On the other hand," I observed, "we are talking about an extraordinary amount of heroin."  *Id*.  And, I noted, even if Banks "did not participate in the planning of the shooting, he admittedly was involved, at a minimum, in helping the shooters . . . flee the country."  *Id*. at 15.

I imposed a sentence principally of 372 months' imprisonment on Count One, the drug charge, and 180 months' imprisonment on Count Two, being an accessory after the fact to murder, the sentences to run concurrently. *Id*.; *see also* Dkt. No. 53.  I imposed a term of five years' supervised release on

_____

[1]    In advance of sentencing, I received and reviewed seven letters on Banks's behalf.  Six came from members of his family: his mother, father, brother, sister, and two nephews.  The seventh came from a Catholic religious brother who taught him at All Hallows.  The letters noted that Banks recognized the harm his actions had caused, wished to be a better model for his family and others, and had a clean record of conduct while incarcerated prior to sentencing. Banks's sister wrote that her "brother was young at the time of his mistake but he was also influence[d] by the negativity and peer pressure of other individuals."  Sent'g Letter of Ilkania Banks (Feb. 8, 2002).

Count One and three years' supervised release on Count Two, the terms also to run concurrently. *Id.*

Banks filed *pro se* two post-conviction motions, both of which I denied. In 2006, he petitioned for relief under 18 U.S.C. § 2255. But in his plea agreement with the Government, Banks had waived his right to appeal a sentence within the Guidelines range; he filed his motion out of time; and the substance of the motion did not merit relief. Dkt. No. 112. In 2019, Banks moved for a sentence reduction under 18 U.S.C. § 3582(c)(2) and Amendment 782 to the U.S. Sentencing Guidelines. Dkt. No. 202. I denied that motion because his sentence was not based on a range subsequently lowered by the Sentencing Commission and because he was not eligible for relief under the First Step Act, as his conviction involved heroin rather than crack cocaine. Dkt. No. 203.

## II.    Motion for Compassionate Release

On August 26, 2022, Banks moved *pro se* for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i), the so-called "compassionate release" statute. Dkt. No. 269. Banks is now 46 years old. He is a U.S. permanent resident whose two children are apparently United States citizens. Sent'g Tr. at 14; *see also* PSR ¶ 82.

The Motion asserted that Banks has exhausted his administrative remedies within the Bureau of Prisons and enumerated several factors that, in his view, constitute extraordinary and compelling reasons for a sentence reduction. These include Banks's chronic medical conditions; the poor health of two of his close relatives, namely, his son Wesley and his mother Minerva; the conditions of his incarceration during the COVID-19 pandemic, including his inability to secure a transfer to a low-security facility after his previous low-security facility was closed; his exemplary disciplinary, educational, and personal record in prison; and his plans to reunite with his family and seek employment upon release.  Motion at 3-8.  Banks appended to his Motion a letter from the warden of Federal Correctional Institution Allenwood (Medium) denying his request for compassionate release, Ex. A; his medical records, Ex. B; materials distributed by prison officials outlining COVID-prevention protocols, Ex. C; and documents describing his educational trajectory while in prison, Ex. D.

The Government submitted a letter in opposition on October 21, 2022.  Dkt. No. 273 ("Gov't Opp. Letter").  The Government opposed Banks's Motion on the basis that his medical conditions, the conditions of his incarceration during the pandemic, and his conduct as a prisoner do not

constitute extraordinary and compelling circumstances warranting a sentence reduction. *Id*. at 4-6. While the Government "acknowledge[d] Banks's exemplary disciplinary record and commend[ed] him for his efforts at rehabilitation," it contended that his rehabilitation "is not comparable" to that of other defendants who have obtained compassionate release. *Id*. at 5. Moreover, the Government argued, even if Banks's circumstances were extraordinary and compelling, the seriousness of his conduct "warranted the commensurately serious sentence this Court gave him." *Id*. at 6.

## III.    Applicable Law

As amended by the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, the compassionate release statute empowers sentencing courts to exercise their judgment in deciding motions such as Banks's. "[R]ather than mandating more lenient outcomes, [the amended statute] often favor[s] giving discretion to an appropriate decisionmaker to consider leniency." *United States v. Brooker*, 976 F.3d 228, 230 (2d. Cir 2020). The statute establishes three criteria that must be satisfied for an incarcerated person to be eligible for a reduced sentence. "First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities."

*United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2020) (per curiam).  Second, the court

must "consider[] the factors set forth in 18 U.S.C. § 3553(a) to the extent that they

are applicable."  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Jones,* 17 F.4th

371, 374-75 (2d Cir. 2020) (per curiam).  Finally, "the inmate must demonstrate

that his proffered circumstances are indeed 'extraordinary and compelling' such

that, in light of the[] § 3553(a) factors, a sentence reduction is justified."  *Keitt*, 21

F.4th at 71.  The second and third inquiries often substantially overlap.

In *Brooker*, after considering the text and legislative history of the

First Step Act, the Second Circuit held that the statute "freed district courts to

consider the full slate of extraordinary and compelling reasons" for a sentence

reduction "that an imprisoned person might bring before them."  976 F.3d at 237.

The only limitation on the sentencing court's discretion arises from another

statute.  In authorizing the work of the U.S. Sentencing Commission, Congress

directed that "[r]ehabilitation of the defendant alone shall not be considered an

extraordinary and compelling reason" for a sentence reduction.  28 U.S.C.

§ 994(t).  Rehabilitation can, however, "interact" with other factors to constitute

extraordinary and compelling reasons to reduce a sentence.  *Brooker*, 976 F.3d at

238 (discussing interaction of rehabilitation and effects of COVID-19 pandemic).

As one court in this District has observed, Congress's "use of the modifier 'alone' evidences that [it] believed that rehabilitation *is relevant* to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (emphasis in original).

Indeed, courts here and elsewhere have regularly found that a set of related considerations, each of which might not be sufficient on its own, can together constitute extraordinary and compelling reasons warranting a sentence reduction. "[T]here is nothing in the compassionate release law requiring that a determination of extraordinary and compelling factors warranting compassionate release must be based on a single circumstance. Rather, as the law permits and common sense dictates, the finding of extraordinary and compelling circumstances warranting release can be based on a combination of circumstances taken together." *United States v. Rengifo*, 569 F. Supp. 3d 180, 192-93 (S.D.N.Y. 2021); *see also, e.g.*, *United States v. Sila*, No. 16-CR-0448-B, 2022 WL 800113, at *5 (N.D. Texas Mar. 16, 2022) (denying sentence reduction where combination of circumstances was not extraordinary and compelling).

11

## IV.    Application

As a threshold matter, Banks has exhausted his administrative

remedies.  *See* Motion Ex. A.  I therefore proceed to consider whether his reasons

for a sentence reduction are extraordinary and compelling.  I conclude that they

are.  I then discuss whether a sentence reduction would be appropriate in light of

the factors set forth in 18 U.S.C. § 3553(a).

*A.    Extraordinary and Compelling Circumstances*

As noted above, Banks has proffered several reasons why his

sentence should be reduced.  It is unclear whether any of these reasons, taken in

isolation, is extraordinary or compelling.  Considering them together, however, I

am persuaded that they are.

First, Banks's medical records reveal that he suffers from several

health conditions.  Some put him at higher risk of severe illness from COVID-19,

and others have been exacerbated by pandemic-era protocols at his correctional

institution.  As of March 18, 2022, Banks stood five feet and eleven inches tall and

weighed 304 pounds, Motion Ex. A at 2, resulting in a body mass index (42.4)

that, according to the federal public health agency, falls into the highest category

of obesity, "severe."  Centers for Disease Control and Prevention, *Defining Adult*

*Overweight and Obesity* (June 3, 2022), https://www.cdc.gov/obesity/basics/adult-defining.html.

A prison medical provider diagnosed Banks with obesity, hyperlipidemia, and prediabetes and recommended that he undertake diet and exercise.  Banks told the provider that doing so "is difficult due to recent COVID-19 restrictions at the institution," the details of which I discuss below.  Motion Ex. A at 1.  Other courts considering motions for compassionate release against the backdrop of the COVID-19 pandemic have found that obesity and related conditions, even when less severe than Banks's, can constitute an extraordinary and compelling reason for a sentence reduction.  *See, e.g., United States v. Anderson*, No. 16-CR-824 (JMF), 2020 WL 2849483, at *2 (S.D.N.Y. June 2, 2020) (body mass index over 40); *United States v. Quinones*, No. 00-CR-761-1 (JSR), 2021 WL 797835, at *2 (S.D.N.Y. Feb. 27, 2021) (body mass index fluctuating around 30).  Admittedly, however, this consideration is less significant now than it was at the outset of the pandemic.  *See, e.g., United States v. Brown*, No. 18-CR-339 (PAC), 2021 WL 5233506, at *3 (S.D.N.Y. Nov. 10, 2021).

The conditions of Banks's incarceration have impeded more than his ability to exercise.  Banks has spent the majority of his sentence in low-security

13

facilities, including Federal Correctional Institution Fort Dix in New Jersey and

the Moshannon Valley Correctional Center in Pennsylvania.  Motion at 4-5.  In

March 2021, however, the Bureau of Prisons ceased housing inmates at

Moshannon Valley because the Government chose not to renew its contract with

the Corrections Corporation of America, the private company that managed the

prison on the Government's behalf.  *Id*. at 4; *see also* The Geo Group, Inc., *The*

*GEO Group Announces Decision by Federal Bureau of Prisons To Not Renew Its*

*Contract for the Moshannon Valley Correctional Facility in Pennsylvania* (Jan. 20,

2021), https://investors.geogroup.com/news-events-and-reports/investor-

news/news-details/2021/The-GEO-Group-Announces-Decision-by-Federal-

Bureau-of-Prisons-To-Not-Renew-Its-Contract-for-the-Moshannon-Valley-

Correctional-Facility-in-Pennsylvania/default.aspx.  Although the Moshannon

Valley facility was reopened in November 2021 and now serves as a detention

center for Immigration and Customs Enforcement, its previous inmates remain

elsewhere.  Motion at 4-5; *see also* Jessica Shirey, *Moshannon Valley Correctional*

*Facility to Reopen as ICE Center*, Gant News (Sept. 29, 2021),

https://gantnews.com/2021/09/29/moshannon-valley-correctional-facility-to-

reopen-as-ice-center/.

Banks is presently housed in the medium-security unit at FCI Allenwood.  He was transferred there some twenty months ago, amidst the pandemic and before vaccines were widely available.  Motion at 4.  He asserts he has been told, and the Government does not contest, that he will not be redesignated to a lower-security facility.  *Id*.  Of course, even without the added burdens the pandemic has imposed, the conditions at a medium-security facility are more onerous than the conditions at a low-security facility.

I have difficulty understanding why Banks, who (as discussed further below) has not had a single disciplinary infraction in more than 23 years' incarceration, must remain at Allenwood.  The situation is all the more unfortunate because the conditions in which Banks has lived during his confinement at Allenwood have been difficult.  Violent incidents involving other prisoners and measures the facility took in response to the COVID-19 pandemic have made Banks's imprisonment significantly more rigorous than I imagined at sentencing.

Documents that Banks enclosed with his Motion paint a vivid picture.  In December 2021, after an outbreak of COVID-19 was discovered, inmates in Banks's unit were confined to their cells for all but 15 minutes, three

times a week, when they were permitted to shower.  They were refused access to

the telephone and email; they could not visit with each other at their cell doors.

Motion Ex. C at 10.  In July 2022, following a subsequent outbreak of the virus,

the prison afforded inmates 30 minutes, three days a week, to shower, use the

phone, and access email.  *Id*. at 1.  From March through May 2022, violence

among inmates led to the prison intermittently being "placed on lockdown

status," including the cancellation of visiting hours for inmates' families.  *Id*. at 4-

5.  As to Banks, he has not been able to see his family -- including his ailing

mother and son -- for over three years.  Motion at 5.

        As other courts in this District have observed, conditions in federal

correctional facilities during the COVID-19 pandemic "have made the experience

of being incarcerated in jail much harder and more scary than could ever have

been anticipated or intended."  *United States v. Robles*, 553 F. Supp. 3d 172, 184

(S.D.N.Y. 2021) (quoting *United States v. Ellison*, No. 18-CR-834 (PAE), Dkt. No.

582 at 80-81).  In light of conditions such as those Banks has reported, courts have

"imposed materially lower sentences than [they] otherwise would have," as well

as found extraordinary and compelling reasons to reduce sentences previously

imposed.  *Id.*; *see also United States v. Tazewell*, 07-CR-1035 (RMB), 2021 WL 21980,

at \*4 (S.D.N.Y. Jan. 3, 2021); *United States v. Tellier*, 92-CR-869 (LGS), 2022 WL

1468381, at \*4 (S.D.N.Y. May 10, 2022); *id.*, Dkt. No. 513.  Like these defendants,

Banks has experienced "extended periods without visitation and with severely

restricted movement within prison," which has "render[ed] the conditions of

confinement far harsher and more punitive than the Court had anticipated."

*United States v. Golding*, 05-CR-538 (JSR), 2022 WL 2985014, at \*4 (S.D.N.Y. July

27, 2022) (internal quotation marks omitted).

Both before and during the pandemic, Banks has compiled an

exemplary record of rehabilitation, education, and leadership among his peers.

He exemplifies the maxim that "[a]s our jurisprudence recognizes, 'no man is

beyond redemption.'"  *Lawson v. U.S. Citizenship & Immigr. Servs.*, 795 F. Supp.

23d 283, 298 (S.D.N.Y. 2011) (quoting *Yuen Jung v. Barber*, 184 F.2d 491, 495 (9th

Cir. 1950)).

It is remarkable that over a twenty-three-year period of

incarceration, Banks has been the subject of no disciplinary incident reports.

Motion at 6.  Far to the contrary, his record reflects sustained efforts to improve

himself, take responsibility for his criminal conduct, and prepare for life outside

of prison.  With his Motion, Banks submitted certificates of completion and

appreciation he received from FCI Fort Dix, where he served the Protestant faith community and completed courses related to scripture and ministry.  Motion Ex. D at 9-14.  Since 2008, he has earned a total of 133 continuing education units from Global University, achieving a 3.72 grade point average in courses focused primarily on religious themes.  *Id.* at 8.  His record also includes twenty-eight workshops, courses, and programs he has taken through the Bureau of Prisons, ranging in subject-matter from secretarial skills to emotional self-regulation and personal finance.  *Id.* at 1-3.  In support of his application for a UNICOR scholarship, Banks's work detail supervisor wrote that he "has an outstanding work ethic and takes great pride in his work."  *Id.* at 4 (cleaned up).  He "has taken ownership in mentoring young men and teaching them to make smarter choices."  *Id.*; s*ee United States v. Underwood*, 88-CR-822 (SHS), 2021 WL 3204834, at *4-*5 (S.D.N.Y. Jan. 15, 2021) (granting sentence reduction in light of similar record of mentorship and absence of disciplinary infractions).

Although Banks has not seen his family since before COVID-19 emerged, he continues to enjoy the support he received at the time I sentenced him.  Upon his release, he plans to reside with his wife, Alba Mora, with whom he had already been together for seven years at the time of sentencing.  PSR ¶ 82.

Banks and Mora will live with their children, Johnathan Banks, now

approximately 25 years old, and Wesley Banks, now approximately 23 years old.

Motion at 8; PSR ¶ 82.  Along with members of his faith community, his family is

prepared to help him find employment and re-enter society.  Motion at 8.  Banks

is particularly eager to spend time with two relatives who have experienced

substantial disabilities.  His son Wesley was diagnosed with partial kidney

damage within two months of birth and has undergone numerous surgeries and

medical procedures.  *Id.* at 3; *see also* PSR ¶ 82.  Banks's mother, Minerva, suffers

from diabetes, high blood pressure, arterial blockages, and problems with her

spinal discs.  *Id.*

The Government urges that none of these factors -- Banks's medical

condition, the impact of modifications to prison operations because of the

pandemic, his rehabilitation, and the situation of his family members --

constitutes extraordinary and compelling reasons for a sentence reduction.  Gov't

Opp. Letter at 4-5.  The Government cites cases in which courts in this District

have denied motions for compassionate release that have presented each of the

issues contained in Banks's Motion.  *Id.*

In some respects, this is a close case.  The Government is right, both at this first stage of the analysis and in reference to one of the section 3553(a) factors, to draw the Court's attention to the seriousness of the crimes to which Banks pleaded guilty.  He sold what I described as an extraordinary quantity of heroin, aided murderers in fleeing justice, and continued selling drugs even after the Reyes organization ceased operating.  The sentence I imposed on him, though not at the top of the applicable Guidelines range, reflected my assessment of the gravity of Banks's conduct.  On the other side of the balance, however, the Government does not contest that Banks has wholeheartedly embraced rehabilitation -- this despite both his health conditions and the stringent conditions of incarceration he has experienced during the pandemic.  In my assessment, the circumstances Banks has proffered in connection with his Motion collectively weigh more than the sum of their parts.  Therefore, I find that Banks has demonstrated extraordinary and compelling reasons for a sentence reduction.

B.      *The Section 3553(a) Factors*

That Banks has asserted extraordinary and compelling reasons for a sentence reduction renders him eligible, under the First Step Act, for such a

reduction.  I may only grant his Motion, however, if I find that a sentence reduction is warranted in light of the applicable factors in 18 U.S.C. § 3553(a).  *See Jones*, 17 F.4th at 374 ("extraordinary and compelling reasons are necessary -- but not sufficient -- for a defendant to obtain relief").  Considering the relevant § 3553(a) factors, I find that further incarceration would be greater punishment than necessary for Banks, who has served nearly 87% of his sentence (taking good time credit into account) and has been subject to conditions far more severe than those I envisioned at sentencing.

It is telling that out of the many factors listed in 18 U.S.C. § 3553(a), the Government's submission focuses on just one: "the nature and circumstances of the offense."  *Id.* § 3553(a)(1); *see* Gov't Opp. Letter at 6.  As just noted, Banks engaged in gravely wrong conduct over a period of several years:  He participated in the sale of over 400 kilograms of heroin, and although he did not participate in Pena-Perez's murder or know about it in advance, he aided its perpetrators after the fact.  *Id.* at 6.  The Government is not wrong that this factor "counsel[s] strongly against release."  *Id.*

At least four other factors, however, weigh in favor of reducing Banks's sentence.  The first is the "history and characteristics of the defendant."

18 U.S.C. § 3553(a)(1).  Prior to becoming part of the Reyes drug ring, Banks was

not involved in known criminal activity of any kind.  PSR ¶¶ 74-76.  His attorney

and family have suggested that he was drawn into the drug trade because of

peer pressure from a close friend.  *See* Def. Sent'g Mem. at 3; Sent'g Letter of

Ilkania Banks.  If that is true, Banks's history is in keeping with research in

cognitive neuroscience that suggests younger persons are "more vulnerable or

susceptible to negative influences and outside pressures, including peer

pressure."  *United States v. Ramsay*, 538 F. Supp. 3d 407, 420 (S.D.N.Y. 2021)

(quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).  To be sure, it is necessary to

"proceed[] with caution" in utilizing these still emerging scientific findings.

*Ramsay*, 538 F. Supp. 3d at 417.  Yet experimental work is increasingly making

clear, as the Supreme Court has observed, that "youth matters in sentencing."  *Id.*

at 415 (quoting *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021)).  Younger persons,

even those in their "early 20s or later," are more likely, as they age, to undergo

rehabilitation and to become able to extract themselves from criminal activity.

*Ramsay*, 538 F. Supp. 3d at 418-23; *see also Rengifo*, 569 F. Supp. 3d at 193-95

(considering youth of defendant who committed serious crimes at age 23).  My

evaluation of Banks's history and characteristics, therefore, encompasses both the

person he was at the time he was drawn into the Reyes network and the person he has shown he is today.  As I described above, Banks's admirable disciplinary record in prison, the relationships he has maintained with his family, and the educational opportunities he has pursued all suggest that he has undergone rehabilitation.  This factor weighs strongly in favor of a sentence reduction.

A second set of factors asks courts to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In Banks's case, these purposes have been accomplished.  He has served twenty-three years, nearly half his life.  As discussed above, he has fulfilled nearly 87% of the sentence I imposed on him.  It is unreasonable to think that Banks's sentence would be a greater deterrent to others or better reflect, in any meaningful way, my evaluation of the seriousness of his offense if it were twenty-six rather than twenty-three years.  Hence, this factor also weighs in favor of a sentence reduction.

Another factor is the need to "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Banks's disciplinary history (or lack thereof) and significant rehabilitation, combined with his age and greater

maturity, suggests there is little such need.  And as the court noted in *United States v. Pena*, 459 F. Supp. 3d 544, 552 (S.D.N.Y. 2020), the fact that Banks was until recently confined in low-security facilities and now remains incarcerated in a medium-security facility as a result of exigencies flowing from the pandemic, combined with a total absence of disciplinary infractions, is convincing evidence "that he does not now pose a danger to the community."  This, too, supports release.

Finally, section 3553(a) mentions the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  As discussed above, Banks has engaged in numerous educational programs, many of them oriented toward ministry in his religious denomination.  There is no evidence that further training within the prison system would offer him additional meaningful benefit.

## V.      Conclusion

For the reasons set forth above, I conclude that further incarceration would be "greater than necessary" to fulfill the purposes of sentencing set forth in section 3553(a).  Because Banks has demonstrated extraordinary and compelling reasons that qualify him for a sentence reduction and the statutory factors weigh in favor of his release, Banks's Motion is GRANTED, and his sentence of imprisonment is modified to time served plus no more than ten days.  All other aspects of his sentence remain in full force and effect.  An Order to this effect will issue simultaneously with this Opinion.

The Clerk of the Court is directed to close Banks's Motion, Dkt. No. 269.

SO ORDERED.

Dated:      New York, New York
            October 31, 2022

DENNY CHIN
United States Circuit Judge
Sitting by Designation